IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIARI SWAIN, #312-546            *

    Plaintiff                            *

        v.                                  *        Civil Action Case No. DKC-10-3317

LAURA BOOTH-MOULDER,[1]         *
LCPC Mental Health
                                         *

    Defendant
                                            ***

**MEMORANDUM OPINION**

Pending is Kiari Swain's ("Swain") prisoner civil rights complaint pursuant to 42 U.S.C. § 1983. Defendant Laura Booth-Moulden ("Moulden"), through her counsel, has filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. The clerk notified Plaintiff of Defendant's dispositive motion and his opportunity to file a reply. *See Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam). Despite the grant of an extension of time to file, no reply was received. The case is ripe for disposition, and the court now rules pursuant to Local Rule 105.6 (D. Md. 2011) no hearing being deemed necessary. For the reasons that follow, Defendant's motion for summary judgment will be granted.

**I.   BACKGROUND**

Swain is an inmate at North Branch Correctional Institution ("NBCI"). Moulden is his mental health counselor. Swain complains that when he asked Moulden to report that he was being abused, harassed, and neglected by correctional officers, she failed to do anything to ensure his safety and mental well-being. Complaint, pp. 1-2. He alleges Moulden "allows

---

[1] Defendant's submissions indicate that her name is correctly spelled "Booth-Moulden." The docket shall be amended accordingly. Defendant's pleadings and exhibits refer to her as "Moulden" as will this Memorandum Opinion and Order.

custody staff to control her actions and tell her how to deal with mental health inmates." *Id*. pp. 2-3. He complains that she fails to make tier rounds once a week to make sure his mental state is stable. *See id*. p. 3. Swain alleges that he suffers increasing mental instability, insomnia, and nightmares because Moulden is not providing him with adequate mental health treatment. As relief, he wants $30,000 "for the constant neglect of Mrs. Laura Booth-Moulden." *Id.*

II.   FACTS

   A.  Mental Health Counseling

In support of her dispositive motion, Moulden has submitted an affidavit and verified exhibits, including Swain's medical and mental health records. They show Swain has been under Moulden's treatment since April, 2009. ECF No. 13, Exhibit 1, Moulden Decl. Swain is also under the treatment of physicians in the Psychiatry Department who have prescribed psychopharmacological medications for him. *Id*. at ¶ 6.[2]

Swain was participating in a behavioral management program which offered him the opportunity to reduce his fourteen-year disciplinary segregation sentence and return to the general prison population if he could demonstrate positive behaviors for one year. Exhibit 1, p. 2. On August 1, 2010, Swain was seen by Moulden for individual therapy. Swain asked to be moved to different housing, and she forwarded his request to his Housing Unit Manager. *Id*. at 2, 7. pp. 8-9; *see also* pp. 3-6.

Moulden saw Swain on September 8, 2010 for individual therapy. In her notes, she wrote: "He has been doing well behaviorally and has been housed in a double cell. He makes

---

[2] On August 16, 2010, Stephen C. Schellhase, M.D. evaluated Swain and adjusted his psychotropic medications. Exhibit 1, pp. 3-6. On August 25, 2010, Jean Helz, M.D. evaluated and adjusted Swain's psychotropic medications, including restarting several medications that had been discontinued earlier that month. *See id*. On September 13, 2010, Swain refused to go to his appointment with Dr. Schellhase. *See id*. p. 12. Dr. Schellhase saw Swain on October 22, 2010, for complaints of depression. Exhibit 1, pp 16-18.

some complaints about petty issues with the BMP (Behavioral Management Program), like rec and shower times, etc, but overall has no major complaints today. *Id*, p. 11. She forwarded a complaint Swain made about the phone system to Lieutenant Harbaugh, Swain's housing unit manager. *See id*. Later that month, Swain made multiple complaints to Moulden about his inmate financial account. She forwarded his concerns to Lieutenant Harbaugh. *Id.* p. 13.

At his October 7, 2010, individual therapy session, Swain expressed misgivings about continuing in the Behavioral Management Program. Moulden's notes read in part:

> We once again discuss[ed] his attitude and narcissism and how it affects his relationships. He also brings up his participation in BMP and almost threatens to sign out. I inform him that the program is voluntary and if he wants to sign out, he will have his dis seg time reinstated (until 2024).

*Id.* p. 14. Moulden's report also indicates that Swain appeared anxious about returning to the general prison population because he had been away from it for so long. She noted that she would discuss with Swain "how he can handle this." *Id*. p. 14.

Moulden updated Swain's chart on October 13, 2010, after he requested access to his mental health records. She informed Swain that Department of Corrections policy requires that he first obtain the Warden's approval. *See id*, p. 15.

After Swain threatened staff and smeared feces, *id*. at 20, Moulden met with him on November 1, 2010 for crisis intervention. Swain's behavior was discussed in the Behavioral Management Program and he faced possible removal. Moulden's notes read:

> He is not demonstrating treatment readiness. Today we work[ed] through some of these issues and I try to point out that I am not willing to reinforce his negative behaviors, and that this may appear to him that I am not trying to help him, but the reality is that I am. I encourage positive behavior and will see him in two weeks to discuss a possible behavior plan if he can demonstrate consistent positive behavior. At this point, I am avoiding the reinforcement of negative behavior and trying to emphasize reinforcement of positive behaviors to get him going in a positive direction.

3

On November 4, 2010, Bruce A. Liller, in the Office of Inmate Health Services noted that a letter had been received from Swain in the office indicating auditory hallucinations as well as suicidal and homicidal ideations. *See id*. p. 21.  Liller's note indicates that Swain was seen by psychology staff the day after Swain sent the letter. [3] *See id*.

On November 15, 2010, Moulden had a follow-up session with Swain to discuss implementing an individual behavior management plan to earn rewards contingent on good behavior.  Swain was encouraged to think of incentives.  *See id*.  pp. 22 and 24.  Shortly afterwards, Swain held the slot in his cell door open, a behavior which made him ineligible for an incentive at his next meeting with Moulden which would be held in two weeks. *See id.*

Four days later on November 19, 2010, Swain set a fire in his cell.  Moulden met with Swain in the segregation unit afterwards for crisis intervention.  This was the first time an inmate had succeeded in setting a fire at North Branch Correctional Institution, and she noted the act required significant premeditation. *See id*. p.  22.   She reported that Swain "stated he was suicidal and that he will set himself on fire if he is given the opportunity" and described him as "severely agitated" and "verbally abusive to staff." *Id*. p. 23 *see also* p. 28.  She placed Swain on suicide watch as a precaution, even though her professional opinion was that his claims of suicide were manipulative and made to get attention. *See id*.  She reported that Swain had threatened her life and stated that he intended to fight corrections officers. *See id*.

On November 22, 2010, Moulden met with Swain and again discussed the possibility of developing an individual incentive plan. See id. p. 25. Swain signed a safety contract during that

---

[3]   Liller's note fails to specify the date of Swain's letter or date of Swain's referenced meeting with psychology staff.  It is likely that Liller was referring to Swain's meeting with Moulden on November 1, 2010.

4

meeting and was removed from suicide precautions. *See id*. p. 27. Swain filed the instant civil rights case on November 23, 2010.

On November 30, 2010, Moulden and Swain discussed incentives if he could maintain positive behavior. *See id*. at 26. Lieutenant Harbaugh and Moulden agreed to allow Swain a phone call as an incentive to maintaining positive behaviors for two weeks. *Id*.[4]

### B. Administrative Remedy Procedure[5]

On July 8, 2010, Swain submitted an ARP alleging that he was verbally threatened on by Officer Caple earlier that day at a BMP review. Swain voluntarily withdrew the request on August 2, 2010. *See* Exhibit 4, Zais Decl. pp. 8-10.

On October 22, 2010, Swain filed an ARP alleging that on October 21, 2010, he:

> …told Officer Banks that I needed to see the housing unit psychology Mrs. L. Mouldon, LCPC because I was having a crisis. Officer Banks then walked of[f] A-tier to talk to Mrs. Moulden. When Officer Banks came back he told me that Mrs. Moulden of psychology department said that she Mrs. Moulden did not care about my crisis in she Mrs. Moulden would see me in 60 days when I stop having the crisis.

*Id*. pp. 12-13. After the ARP was investigated, it was dismissed on January 11, 2011.

---

[4] Swain was seen by Dr. Helz on December 8, 2010. Exhibit 1, p. 43.

[5] With his complaint, Swain filed copies of three inmate requests addressed to Moulden. None bears a receipt stamp showing it was received by Moulden or prison authorities or otherwise properly filed through the ARP process. In his request dated October 31, 2010, he complains that he is "starting to hear voices again," can't sleep well, and officers call and tell him to kill himself. In his request dated October 24, 2010, he complains that he was denied a shower. Swain states "I'm upsit [sic] and I don't know what to do about this problem that I'm having. I need help bad. I don't know how much more that I can take." In his second request dated October 24, 2010, Swain alleges that he was assaulted by Officer Caple on October 20, 2010. Swain also complained of blood upon urination and defecation. Complaint, Attachments.

Swain has also submitted a copy of a request dated October 24, 2010, to Ms. Harr, Social Work, in which he complains he was assaulted by Officer Caple on October 20, 2010, and a request dated October 23, 2010 to "Ms. A Rozas" in which he again complained he was assaulted on October 20, 2010 by Officer Caple. *See id*. The requests to Ms. Harr and Ms. Rozas do not bear receipt stamps to indicate they were received by the intended recipients.

The response reads:

> Specifically, your complaint is that you had a crisis on 10/21/10, and the Psychologist would not see you for 60 days. An investigation revealed that you were seen by Psychiatrist out of schedule on 10/22/10 due to saying you need to be seen. You did not mention any "crisis" to the Doctor and expressed that you were doing "ok" psychologically. You were also seen by a different Psychiatrist on 11/11/10 for therapy and informed him that Psychology would not reinforce your acting out behaviors by seeing you unless it is a crisis by definition, which means you or someone elses life is in danger. It is advised that you talk to your Housing Unit Manager/Lieutenant about any additional questions regarding this matter. Your administrative remedy allegations are without merit.

On October 25, 2010, Swain filed a request for administrative remedy ("ARP") in which he accused Officer Caple of assaulting him in front the medical unit on October 20, 2010 in front of medical and corrections staff. *See id*. pp. 6-7. The ARP was dismissed on November 18, 2010 as previously resolved, repetitive, or was previously addressed through the ARP process. Exhibit 4, p. 6. There is no record that a Serious Incident Report or Use of Force report was generated for an assault involving Swain on October 20, 2010. Exhibit 3, Durst Decl. ¶ 5, Exhibit 3.

### III.  STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(a):

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249(1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Electric Industrial. Co. Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654(1962)). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

This court has held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md.2001) (citation omitted). Indeed, the court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d

774, 778–79 (4th Cir.1993) (quoting *Felty v. Graves–Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)).

    IV.        **DISCUSSION**

        **1.  Claim of Inadequate Mental Health Care**

Prisoners are entitled to receive reasonable treatment for serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  Failure to provide treatment, when indicating a "deliberate indifference to serious medical needs of prisoners" results in "the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment." *Id*. at 104.  Deliberate indifference is shown by establishing that the defendant had actual knowledge or awareness of an obvious risk to a plaintiff's serious medical need and failed to take steps to abate that risk.  *See generally, Farmer v. Brennan*, 511 U.S. 825 (1994); *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101 (4th Cir. 1995).  Prisoners also have an Eighth Amendment right to be free from deliberate indifference to serious their psychiatric needs. *See Comstock v. McCray*, 273 F.3d 693, 702 (6th Cir. 2001).  There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *See Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir.1977).  An inmate is entitled to psychological or psychiatric treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty 1) that the prisoner's symptoms evidence a serious disease or injury; 2) that such disease or injury is curable or may be substantially alleviated; and 3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id*.  The essential test is one of medical necessity and not simply that which may be considered merely desirable.  *Id*. at 48.  A

8

court will not intervene upon allegations of mere negligence, mistake or difference of opinion. *See id.*[6]

Assuming Swain shows serious need for psychological and psychiatric treatment, the record is clear that he received on-going mental health support from Moulden and physicians in the psychiatry department. Moulden provided mental health counseling to Swain at regularly scheduled monthly meetings and as needed for crisis intervention. While Swain may disagree with Moulden over the appropriate course of his mental health treatment, he fails to demonstrate that she acted with deliberate indifference to his serious mental health needs. Viewing the facts in the light most favorable to Swain, there is no evidence that there is a genuine issue for trial and Defendant is entitled to summary judgment as a matter of law.

### B. Failure to Protect Claim

Deliberate indifference in the context of a prisoner failure-to-protect claim requires that a defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. at 837 (1994); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302-303 (4th Cir. 2004). Unless a prison official actually makes this inference, he does not act with deliberate indifference, even where his actions violate prison regulations or can be described as stupid or lazy. *See Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir.1997); *see also Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir.1997). Further, to state a claim for damages, the inmate must show a serious physical injury. *See De Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir.2003).

---

[6] Thus, to the extent that he wants damages for Moulden's purported "negligence," his claim fails to state a cognizable Eighth Amendment claim.

In her affidavit, Moulden attests that whenever Swain, or any other inmate, tells her about abuse or assault, she reports the information immediately to the Housing Unit Manager. Exhibit 1, Moulden Decl. ¶ 4. Insofar as Swain alleges that Moulden failed to protect him from harm from assault by Officer Caple on October 20, 2010, his claim is refuted by the record. First, there is no institutional record that the October 20, 2010 assault occurred. Durst Decl. ¶ 5, Exhibit 3. Swain claims the assault took place in the medical unit and in front of several corrections officials and a medical provider, but does not allege Moulden was present. Exhibit 4, pp 6-7. Further, there is no record of a Serious Incident Report or Use of Force report for an assault involving Swain on that date. Next, when Swain saw Dr. Schellhase for depression on October 22, 2010, two days after the alleged assault, Swain made no mention of it. Exhibit 1, pp. 16-18.[7] Lastly, there is no mention of the assault in Moulden's notes. In sum, there is no evidence that Moulden was aware of the claimed assault. Swain fails to show sufficient factual predicate that Moulden acted with deliberate indifference to protect him from harm and Defendant is entitled to summary judgment in her favor.

## V.     CONCLUSION

For these reasons, the court will grant Defendant's motion for summary judgment. A separate Order follows.

Date:   December 8, 2011                                /s/
                                                        DEBORAH K. CHASANOW
                                                        United States District Judge

---

[7] Swain was not scheduled for a pass to see Dr. Schellhase on October 22, 2010, but was given an appointment after he asked to been seen that day. It is not unreasonable to assume Swain would have mentioned the assault at a meeting scheduled on an urgent basis.